**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION**

RACHAEL DANKER, JOHN DOE, JESSE
JOHNSON, SAMANTHA JOHNSON,
AMANDA JUNGMAN, STEPHANIE
NELSON, AUBREY WILHITE, DON
WILLIAMS, and JULIE WILLIAMS,

Plaintiffs,

v.

THE CITY OF COUNCIL BLUFFS, IOWA,

Defendant.

Case No. 1:20-cv-16

## COMPLAINT

Plaintiffs Rachael Danker, John Doe[1], Jesse Johnson, Samantha Johnson, Amanda Jungman, Stephanie Nelson, Aubrey Wilhite, Don Williams, and Julie Williams (collectively, "Plaintiffs"), for their Complaint against the Defendant, state and allege as follows:

### INTRODUCTION

1.     This is a civil rights action for declaratory and injunctive relief arising under 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. § 2201, and the laws of the State of Iowa.  This action stems from Defendant's violations of Plaintiffs' rights under the United States Constitution arising from Defendant's enforcement of a ban on certain breeds of dogs in Council Bluffs, Iowa.

---

[1] Plaintiff John Doe brings this action using pseudonyms for their self and their dog, based on the need for anonymity in the lawsuit.  John Doe has a substantial privacy right and must remain anonymous, as they are challenging governmental activity and would be forced to admit their intention to engage in potentially illegal conduct, thereby subjecting themselves to potential loss of their dog, civil sanctions, and even criminal penalties.  John Doe will bring a Motion for Leave to Proceed Under Pseudonym for the Court to permit them to proceed in the litigation anonymously.

HB: 4838-4851-7560.9

2.      In 2004, The City of Council Bluffs, Iowa ("Council Bluffs" or the "City") adopted a Pit Bull Ban, now codified at Council Bluffs Code Chapter 4.20.112 (the "Pit Bull Ban" or "Ordinance") and titled "Pit Bulls Prohibited," which prohibits keeping or harboring "any dog that is an American Pit Bull Terrier, American Staffordshire Terrier, Staffordshire Bull Terrier, or any dog displaying the majority of physical traits of any one or more of the above breeds (more so than any other breed), or any dog exhibiting those distinguishing characteristics which substantially conform to the standards established by the American Kennel Club or United Kennel Club for any of the above breeds." COUNCIL BLUFFS, IOWA, CODE CHAPTER § 4.20.112(B).

3.      Upon information and belief, the City adopted the Pit Bull Ban in an effort to remove dangerous dogs from the city limits of Council Bluffs and/or reduce the number of dog bites within the city limits of Council Bluffs.

4.      The Pit Bull Ban became effective in 2004, and at all relevant times, it has been the pattern, practice and custom of the City of Council Bluffs and its officers, agents, and employees to enforce the Pit Bull Ban as written since its inception.

5.      The Pit Bull Ban authorizes the City to impound and destroy any dog it deems subject to the Pit Bull Ban and provides that any person who violates the Pit Bull Ban may be subject to a municipal infraction subject to a fine of up to $750 plus surcharge and court costs for a first offense, and $1,000 for a second and subsequent offense. *See* COUNCIL BLUFFS, IOWA, CODE CHAPTER § 1.95.020(B).  Each day that a violation is permitted to exist constitutes a separate offense.  COUNCIL BLUFFS, IOWA, CODE CHAPTER § 1.95.020(C); 4.20.010(C).

6.      A violation of the Pit Bull Ban may result in a criminal misdemeanor citation with a fine of up to $500 and up to thirty days imprisonment.  COUNCIL BLUFFS, IOWA, CODE CHAPTER §§ 4.20.010(A); 8.02.020.

2

7.      Defendant has enforced or threatened enforcement of the Pit Bull Ban against Plaintiff Rachael Danker's dog Loki, Plaintiffs Jesse and Samantha Johnson's dogs George and Charlie, Plaintiff Amanda Jungman's dog Stitch, Plaintiff Aubrey Wilhite's dog Chunk, and may imminently enforce the Pit Bull Ban against all Plaintiffs' current dogs.

8.      As a result of the actual enforcement of the Pit Bull Ban, Plaintiffs Rachael Danker, Jesse and Samantha Johnson, Amanda Jungman, and Aubrey Wilhite were required to relinquish possession and relocate their dogs outside of Council Bluffs' city limits.

9.      As a result of the potential enforcement of the Pit Bull Ban and Plaintiffs' reasonable fear of enforcement of the Pit Bull Ban, Plaintiffs are concerned that their current dogs may similarly be subject to impoundment and euthanasia under the Pit Bull Ban.

10.      The Pit Bull Ban has thereby deprived Plaintiffs of the comfort, companionship, and sense of security that their dogs provide them and subjected each of the Plaintiffs to a reasonable concern that their property may be destroyed and euthanized under the Pit Bull Ban. The Pit Bull Ban has further subjected each of the Plaintiffs to a reasonable concern that they may be charged with civil or criminal violations.

## JURISDICTION AND VENUE

11.      This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities secured by the Constitution of the United States and other federal statutes.

12.      This Court has federal question jurisdiction over this controversy under 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

HB: 4838-4851-7560.9

13.     Venue is proper in the Western District of Iowa under 28 U.S.C. § 1391(b)(1)&(2). The Defendant is a city located in the Western Division of this Judicial District and a substantial part of the events or omissions giving rise to the claim occurred in the Western Division of this Judicial District.

## PARTIES

14.     Plaintiff Rachael Danker is an individual who has resided in Council Bluffs, Iowa at all relevant times related to the enforcement of the Pit Bull Ban against Rachael Danker's dog, Loki, as alleged in this Complaint.

15.     Plaintiff John Doe is an individual who has resided in Council Bluffs, Iowa at all relevant times related to the enforcement of the Pit Bull Ban against John Doe's dog as alleged in this Complaint.

16.     Plaintiffs Jesse and Samantha Johnson are individuals who have resided in Council Bluffs, Iowa at all relevant times related to the enforcement of the Pit Bull Ban against Jesse and Samantha Johnson's dogs, George and Charlie, as alleged in this Complaint.

17.     Plaintiff Amanda Jungman is an individual who has resided in Council Bluffs, Iowa at all relevant times related to the enforcement of the Pit Bull Ban against Amanda Jungman's dog, Stitch, as alleged in this Complaint.

18.     Plaintiff Stephanie Nelson is an individual who previously resided in Council Bluffs, Iowa and now lives in Crescent, Iowa.  After moving as a result of the Pit Bull Ban, Stephanie Nelson has made occasional visits with her dog to Council Bluffs at all relevant times related to the potential enforcement of the Pit Bull Ban against Stephanie Nelson's dog, Oakley, as alleged in this Complaint.

HB: 4838-4851-7560.9

19.     Plaintiff Aubrey Wilhite is an individual who has resided in Council Bluffs, Iowa at all relevant times related to the enforcement and threatened enforcement of the Pit Bull Ban against Aubrey Wilhite's dog, Chunk, as alleged in this Complaint.

20.     Plaintiffs Don and Julie Williams are individuals who have resided in Council Bluffs, Iowa at all relevant times related to the enforcement of the Pit Bull Ban as alleged in this Complaint.

21.     Defendant City of Council Bluffs, Iowa is a municipality for purposes of liability under 42 U.S.C. § 1983 and is located within the geographic area comprising the Western District of Iowa.

22.     Defendant Council Bluffs and those City employees acting under its direction and control are hereinafter referred to as "Animal Control."

23.     At all relevant times, it has been the pattern and custom of Animal Control to enforce the Pit Bull Ban against dogs and dog owners located within the Council Bluffs city limits.

## FACTUAL ALLEGATIONS

### Rachael Danker's Dog, Loki

24.     Rachael Danker ("Danker") moved to Council Bluffs in November of 2019, along with her 6-month-old mixed-breed male dog, Loki.

25.     Loki has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

26.     Within a few weeks of moving to Council Bluffs, Animal Control informed Danker she had to remove Loki from Council Bluffs because he was subject to the Pit Bull Ban.

27.     Danker asked Animal Control to test Loki to confirm he met the definition of a Pit Bull.  Animal Control refused to do so.

HB: 4838-4851-7560.9

28.     Danker was given thirty (30) days to relocate Loki.

29.     Danker re-homed Loki to a friend in California.

30.     In the absence of the Pit Bull Ban, Danker would get another dog with similar physical characteristics to Loki.

## John Doe's Dog

31.     John Doe moved to Council Bluffs in July of 2014, works within the City, and has a 7-year-old female Boston Terrier mix.

32.     John Doe's dog has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

33.     John Doe has knowledge of two other people in his neighborhood who had their dogs taken from them or been forced to relocate their dogs due to the Pit Bull Ban and an Animal Control determination that the dogs appeared to be subject to the Pit Bull Ban.

34.     John Doe believes that his dog looks similar to other dogs that Animal Control deemed were subject to the Pit Bull Ban and has a reasonable concern that Animal Control may order the removal, impoundment, or euthanization of his dog pursuant to the Pit Bull Ban.

## Don and Julie Williams

35.     Don Williams and Julie Williams ("Williams") are the parents and neighbors of Plaintiff Samantha Johnson.  The Williams often watched the Johnson's dogs, George and Charlie, at their home.

36.     While the Johnson's dogs were playing in the Williams' backyard, Animal Control instructed the Williams to inform the Johnsons that George and Charlie were subject to the Pit Bull Ban and must be relocated outside of the City.

37.     The Williams have three elderly dogs and intended to get dogs with similar physical characteristics to George and Charlie when their existing dogs died because they enjoyed taking care of George and Charlie.

38.     If the Pit Bull Ban were repealed, the Williams would adopt dogs with similar physical characteristics to George and Charlie.

### Jesse and Samantha Johnson's Dogs, George and Charlie

39.     In July of 2019, Jesse Johnson and Samantha Johnson ("Johnsons") moved to Council Bluffs with their two dogs, George and Charlie.

40.     The Johnsons were uncertain of the origin of George and Charlie, but were aware that some peopled labeled them as pit bulls.

41.     George and Charlie have never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

42.     In November of 2019, Animal Control informed the Johnsons that George and Charlie were subject to the Pit Bull Ban and had to be relocated outside of the City within one week or would be taken from them by Animal Control.

43.     Animal Control informed the Johnsons that if necessary, a warrant could be issued to seize the dogs and they would be immediately euthanized if aggressive.

44.     The Johnsons relocated George and Charlie to a friend's house in Crescent, Iowa. Animal Control returned to the house to make sure the dogs had been removed.

45.     If the Pit Bull Ban were repealed, the Johnsons would bring George and Charlie back to live with them.

### Amanda Jungman's Dog, Stitch

46.     Amanda Jungman ("Jungman") moved to Council Bluffs in early 2014 with her dog, Stitch.

47.     Stitch has never bitten or harmed any person, threatened harm toward any person, or acted aggressively.

48.     In July of 2015, Animal Control approached Jungman while she was in her fenced-in backyard with Stitch. Animal Control informed Jungman that Stitch was subject to the Pit Bull Ban and that she had seven days to remove Stich from Council Bluffs.  The officer indicated that Animal Control would follow up to ensure Stitch was removed from Council Bluffs at the end of that period.

49.     Jungman's mother took Stitch to Animal Control to object to Animal Control's determination that Stich was subject to the Pit Bull Ban, but Galen Barrett, Chief Animal Control Officer for the City of Council Bluffs, Iowa, visually examined Stitch and determined he was subject to the Pit Bull Ban.

50.     Jungman re-homed Stitch to a friend in Omaha.

51.     Stitch died in 2017.

52.     If the Pit Bull Ban were repealed, Jungman would adopt another dog with similar physical characteristics to Stitch.

**Stephanie Nelson's Dog, Oakley**

53.     Stephanie Nelson ("Nelson") lived in Council Bluffs her entire life until she recently moved to Crescent, Iowa to avoid the Pit Bull Ban.

54.     Nelson has a 2-year-old dog of unknown origin named Oakley.  Nelson works in Council Bluffs and her family resides in the City.

55.     Oakley has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

56.     Nelson moved to Crescent to avoid having her dog taken from her pursuant to the Pit Bull Ban after a neighbor threated to report Nelson and Oakley to Animal Control for violating the Pit Bull Ban.

57.     Although Nelson no longer lives in Council Bluffs, she regularly brings Oakley to Council Bluffs for veterinary treatment and to visit family.

58.     Nelson reasonably fears that she will be charged for violating the Pit Bull Ban and that Animal Control will take Oakley away from her under the Pit Bull Ban, even though her trips into the City are brief.

59.     If the Pit Bull Ban were repealed, Nelson would move back to Council Bluffs with Oakley and would otherwise be free from concern that the Pit Bull Ban will be enforced against her or Oakley during her trips to Council Bluffs.

**Aubrey Wilhite's Dog, Chunk**

60.     Aubrey Wilhite ("Wilhite") has a 6-year-old male dog named Chunk who she purchased from a breeder in Des Moines, Iowa.  At the time of purchase, she was told the dog was a lab-boxer mix.

61.     Chunk has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

62.     In December of 2019, Chunk got out of the yard and was picked up by Animal Control.  When Wilhite came to pick up Chunk from Animal Control, Galen Barrett determined that Chunk was a pit bull because he saw Chunk "smile" and informed Wilhite that only pit bulls "smile."

HB: 4838-4851-7560.9

63.     Animal Control released Chunk to Wilhite's sister to re-home Chunk to Bellevue, Nebraska.

64.     On April 2, 2020, Chunk and Wilhite's other dog, Apollo, a Dalmatian mix, were at Wilhite's home in Council Bluffs and escaped from her yard.  Wilhite posted a photo of both dogs online to help find them.

65.     Wilhite quickly located Chunk but Apollo was taken into Midlands Humane Society, the facility utilized by Animal Control.

66.     When Wilhite went to Midlands Humane Society to claim Apollo, Galen Barrett confronted Wilhite about the online photos seeking to find both Apollo and Chunk.

67.     Barrett told Wilhite she had to remove Chunk from the City, or he would get a warrant to search Wilhite's home and remove Chunk.

68.     Wilhite temporarily relocated Chunk to a friend's house in Omaha following Barrett's threat to obtain a warrant to search her home.

69.     Being familiar with the discriminatory animus against any dogs perceived to be pit bulls by Animal Control, Wilhite fears that Animal Control will impound and euthanize Chunk under the Pit Bull ban if she brings Chunk back to Council Bluffs.

70.     If not for the Pit Bull ban, Wilhite would bring Chunk back to her residence without fear that Chunk will be taken from her by Animal Control under the Ordinance

**UNRELIABILITY OF VISUAL BREED IDENTIFICATION OF MIXED BREED DOGS**

71.     All Plaintiffs except those identified as possessing dogs of known origin, possessed mixed breed dogs of unknown origin.

72.     Over the past decade, the understanding of the canine genome has increased greatly. Through scientific study, it is now possible to determine breed composition of dogs through DNA analysis.

73.     Study of the canine genome has also resulted in the development of gene markers which identify those genes related to physical appearance.  There are approximately 20,000 protein coding genes in the canine genome.  Of these, fewer than 1% control the external morphological features associated with the physical appearance attributed to specific breeds of dogs (e.g., ear shape and size, length of legs, length of coat, coat color, color pattern, shape of head, body size and type, and length of muzzle).

74.     Due to the manner in which genes combine when dogs of different breeds are mated, mixed breed dogs commonly express physical traits and characteristics that are unrelated to their actual primary breed composition as determined by DNA testing.

75.     Due to those same genetic combination factors referenced above, mixed-breed dogs often do not express the physical traits and characteristics that are commonly associated with the breeds that do make up their actual primary breed composition as determined by DNA testing.

76.     Even purebred dogs bred together can have offspring that look different than its parents, even to the extent of no longer matching the AKC standards for that purebred dog.

77.     As a result, scientific studies have determined that even people with training in identifying dog breeds are wrong more often than not in determining the primary breed of a mixed-breed dog based on visual analysis when compared to the animal's actual primary breed composition as determined by DNA testing.

78.     According to a manual published by the National Animal Control Association ("NACA"), visual identification of heritage of a mixed-breed dog is nearly impossible.

HB: 4838-4851-7560.9

79.     The NACA Manual advises that AKC breed standards only provide "the ideal example" of the breed, and that many dogs which do not pass the ideal standards "are sold as 'pet quality' dogs."  The NACA manual also states that "Animal Control Officers don't often come face-to-face with ideal representatives of the various breeds," and that many dogs bred unconventionally may "bear little more than a faint resemblance to the breed standard."

80.     There are more than twenty breeds of dogs commonly misidentified as the "type" or breeds prohibited by the Pit Bull Ban .

**UNRELIABILITY OF BREED AS A PREDICTOR OF DANGEROUSNESS**

81.     Although media and news outlets commonly report that certain breeds of dogs are thought to be a greater risk to bite humans than other breeds of dogs, there is no scientific or epidemiological basis for these statements.

82.     Supposed scientific conclusions made even as recently as 2005 regarding the efficacy of breed bans are now outdated due to a significant advancement in knowledge regarding dog behavior and genetics.

83.     Most non-scientific claims that assert certain breeds pose a greater risk of dangerousness to humans rely on a twenty-year-old study conducted by individual investigators from the Centers for Disease Control and Prevention ("CDC'), the Humane Society of the United States ("HSUS"), and the American Veterinary Medical Association ("AVMA") (*See* Sacks, Jeffrey J., Leslie Sinclair, Julie Gilchrist, Gail C. Golab, and Randall Lockwood. "Breeds of Dogs Involved in Fatal Human Attacks in the United States between 1979 and 1998." *Journal of the American Veterinary Medical Association* 217.6 (2000): 836-40) (available at: https://www.avma.org/Advocacy/StateAndLocal/Documents/javma_000915_fatalattacks.pdf) ("AVMA Article").

12

84.     In response to the non-scientific claims that the AVMA Article concluded that certain breeds of dogs were more dangerous than other breeds of dogs, the AVMA issued the following statement:

> In contrast to what has been reported in the news media, the data contained within this report **CANNOT be used to infer any breed-specific risk** for dog bite fatalities (e.g., neither pit bull-type dogs nor Rottweilers can be said to be more "dangerous" than any other breed based on the contents of this report). To obtain such risk information it would be necessary to know the numbers of each breed currently residing in the United States. Such information is not available.
>
> Data in this report indicate that the number of dogs of a given breed associated with fatal human attacks varies over time, further suggesting that such data should not be used to support the inherent "dangerousness" of any particular breed.  More than 25 breeds have been involved in fatal human attacks over the 20-year period summarized in this report.

(emphasis in original)

85.     The AVMA further stated, "Statistics on fatalities and injuries caused by dogs cannot be responsibly used to document the 'dangerousness' of a particular breed, relative to other breeds, for several reasons."

86.     The CDC responded to the non-scientific use of the AVMA Article by warning that the study "does not identify specific breeds that are most likely to bite or kill, and thus is not appropriate for policy-making decisions related to the topic."

87.     HSUS responded to the use of the AVMA Article to support breed-specific bans with a statement that "There is no evidence that breed-specific laws reduce dog bites or attacks on people, and they divert resources from more effective animal control and public safety initiatives. . . . Breed-based policies aren't founded on science or credible data, but on myths and misinformation surrounding different breeds."

88.     Scientific studies have demonstrated that there is nothing inherently different about the breeds of dogs prohibited by the Pit Bull Ban that set them apart from other dogs in terms of behavior.

89.     The breeds of dogs prohibited by the Pit Bull Ban do not have unusual strength for their size, nor do they have a different jaw size or any jaw "locking" mechanism.

90.     The genes influencing behavioral traits such as aggression in mammals are not yet known, despite large scale studies seeking them in human research.

91.     Today, behavioral traits are believed to be highly polygenic, meaning they are influenced by many, many genes, each with very small effect size.

92.     These genes are also believed to be epistatic, meaning that they interact with each other in highly unpredictable ways – a particular version of gene A may have one effect when present with a particular version of gene B, but may have the opposite effect when present with a different version of gene B (or a particular version of gene C).  Epistasis is one of the reasons why reliably controlling behavioral characteristics by selective breeding is difficult: a version of a gene having one effect in a parent animal may have the opposite effect in offspring, when expressed against a different genetic background.

93.     For all of these reasons, genetics are not highly predictive of behavior in dogs. Environmental influences, such as appropriate early socialization and maintenance in the home as a family dog, are more predictive of a dog's behavioral traits than its genetics.

94.     Breed bans are not a rational approach to addressing the public health concerns of dog bites.

HB: 4838-4851-7560.9

## OPERATION OF THE COUNCIL BLUFFS PIT BULL BAN

95.    Brandon Garrett is the City Administrator of Council Bluffs, Iowa.  Among other official capacity duties, Garrett is responsible for enforcing Council Bluffs' Pit Bull Ban by entertaining a dog owner's written request for a hearing, acting as the hearing officer, and rendering the final and conclusive written decision of the hearing determination.  COUNCIL BLUFFS, IOWA, CODE CHAPTER §§ 4.20.010(A); 4.20.112(F).  Upon information and belief, Garrett has exercised his authority to enforce the Pit Bull Ban by, among other things, adopting a policy and practice of enforcing the Pit Bull Ban and directing City officers under his supervision and control to force Plaintiffs and others to remove their dogs from the City and to threaten enforcement of the Pit Bull Ban against Plaintiffs and other non-parties to this action.

96.    Galen Barrett is the Chief Animal Control Officer for the City of Council Bluffs, Iowa.  Barrett is authorized in his official capacity to enforce Council Bluffs' animal control ordinances, including the Pit Bull Ban.  See COUNCIL BLUFFS, IOWA, CODE CHAPTER § 4.20.010(A).  Barrett also is authorized to direct the impoundment of dogs believed to be "pit bulls" and to "destroy" any dog believed to be a "pit bull."  See COUNCIL BLUFFS, IOWA, CODE CHAPTER 4.20.112(E).  Barrett has exercised his authority to enforce the Pit Bull Ban by, among other things, forcing Plaintiffs and others to relocate their dogs outside of Council Bluffs.

97.    For mixed-breed dogs, the Council Bluffs Pit Bull Ban relies on visual identification to determine whether an animal displays "the majority of physical traits of any one or more of the above breeds"… American Pit Bull Terrier, American Staffordshire Terrier, or Staffordshire Bull Terrier… "(more so than any other breed), or any dog exhibiting those distinguishing characteristics which substantially conform to the standards established by the American Kennel Club or United Kennel Club" for these breeds.

HB: 4838-4851-7560.9

98.     Upon information and belief, the Council Bluffs Officials, or officers in the field under their direction, make their subjective determinations as to whether a dog is a pit bull or has the "predominant characteristics" of a pit bull based on their visual inspection of the dog.

99.     Due to the Pit Bull Ban's reliance on visual breed identification for mixed-breed dogs, more often than not:

      a.      Mixed-breed dogs will be visually identified as predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier, though none of these breeds will, in fact, be the predominant breed of the animal; and

      b.      Mixed-breed dogs will not be visually identified as predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier, though one or more of these breeds will, in fact, be the predominant breed of the animal.

100.    On information and belief, numerous incidents have occurred wherein the Council Bluffs Officials, or officers under their direction, authorized or encouraged by the Pit Bull Ban, made arbitrary and/or discriminatory decisions as to which dogs to confiscate under the Ordinance.

101.    As a result of the vague and ambiguous language of the Pit Bull Ban, these arbitrary and/or discriminatory decisions are permitted by law and cannot be practicably challenged.

102.    Further, as Animal Control officers may take virtually any dog under guise of the Pit Bull Ban, regardless of official documentation or DNA tests showing the dog is not a pit bull, an ordinary citizen cannot know whether their dog—particularly if it is a mixed-breed dog—is subject to the Ordinance.

103.    The Pit Bull Ban results in a scenario wherein whether any particular citizen's dog is subject to the Pit Bull Ban can often depend on the moment-to-moment judgment of an Animal Control Officer on their patrol.

HB: 4838-4851-7560.9

104.     Approximately one-half of the 80 million dogs in the United States are mixed-breed dogs.

105.     Upon information and belief, one-half of the dogs in Council Bluffs are mixed-breed dogs.

106.     Statistically, for the mixed-breed dog population of Council Bluffs, the Pit Bull Ban will misclassify more than one-half of all mixed-breed dogs and ban dogs that should not be banned under the Pit Bull Ban and fail to ban dogs that the Pit Bull Ban requires be banned.

107.     Upon information and belief, Council Bluffs has no evidence of the effectiveness of the Pit Bull Ban.

**CLAIM FOR RELIEF**
**Violation of the United States Constitution**
**(42 U.S.C. § 1983)**

108.     Plaintiffs incorporate the allegations contained in Paragraphs 1 through 107 as if realleged in this paragraph.

109.     The Pit Bull Ban is unconstitutionally vague because it fails to provide fair warning of exactly what actions and what animals are prohibited by the Pit Bull Ban:

a.     The Pit Bull Ban's identification of the animals subject to the ban are overly vague and lack sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or to provide persons of ordinary intelligence a reasonable opportunity to know what specific animals are prohibited by the Pit Bull Ban;

b.     The definitions of the animals banned by the Pit Bull Ban allow for arbitrary, inconsistent, and discriminatory enforcement by Defendant.

110.     Defendant has enforced and continue to enforce the Pit Bull Ban in an arbitrary, inconsistent, and discriminatory manner.

HB: 4838-4851-7560.9

111.    The Pit Bull Ban is overinclusive as a safety regulation because it bans animals that do not pose a risk of harm to others.

112.    The Pit Bull Ban is underinclusive as a safety regulation because it fails to ban animals that do pose a risk of harm to others.

113.    By deeming all predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier dogs as dangerous, the Pit Bull Ban bears no rational relationship to any legitimate state interest in health, safety or welfare and violates Plaintiffs' substantive due process rights.

114.    The Pit Bull Ban's disparate classification and treatment of owners of predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier dogs from owners of all other breeds of dogs bears no rational relationship to any legitimate state interest and violates the Equal Protection rights of Plaintiffs as guaranteed by the Constitution.

115.    Under Iowa law, Plaintiffs have a protectable property interest in their dogs and in their money.

116.    The Pit Bull Ban authorizes Defendant to immediately impound any dog they suspect to be prohibited under the Pit Bull Ban.  *See* COUNCIL BLUFFS, IOWA, CODE CHAPTER 4.20.112(E).

117.    The Ordinance imposes a short seven-day limit on owners who wish to request a breed-determination hearing.  The time limit begins to run on the day of impoundment, regardless of notification to the owner.  *See* COUNCIL BLUFFS, IOWA, CODE CHAPTER 4.20.112(F).

118.    The breed-determination hearing does not provide dog owners a meaningful opportunity to respond to allegations against them.

119.    The Pit Bull Ban states that the appellant-owner has the burden of proof to show that a dog is not a pit bull.  *See* COUNCIL BLUFFS, IOWA, CODE CHAPTER § 4.20.112(F).

120.    The Pit Bull Ban does not specify the quantum of evidence that a dog owner must satisfy to prevail at a breed-determination hearing.

121.     The Pit Bull Ban further provides, "The administrative authority or hearing officer shall make a final determination whether the dog is a pit bull as defined in paragraph B,2 of this section.  Such final determination shall be considered a final order of the administrative authority subject to review as provided in CBMC 4.20.132."  COUNCIL BLUFFS, IOWA, CODE CHAPTER 4.20.112(F).

122.    The Pit Bull Ban provides imposes no time limit on how soon a breed-determination hearing must be held.  Meanwhile, the impoundment fees continue to accrue at the owner's expense.  *See* COUNCIL BLUFFS, IOWA, CODE CHAPTER § 4.20.112(F).

123.    The Pit Bull Ban provides no mechanism for an owner to receive an official breed determination before the dog is seized.  Only after the City impounds a dog and the owner incurs impoundment fees, can the owner contest the City's breed determination.

124.     The Pit Bull Ban does not contain any provision requiring the City to return impoundment fees to a prevailing owner whose dog was wrongfully impounded.

125.    The threat of indefinite impoundment and associated fees dissuade affected dog owners from exercising their due process rights.

126.    All of the above actions and omissions are the official policies, practices and customs of the Defendant.

127.     The official policies, practices and customs of the Defendant as described above violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Enter judgment declaring that the Pit Bull Ban and related policies, practices, and customs of the Defendant violates the Fourteenth Amendment to the United States Constitution and may not lawfully be enforced in the future;

2.      Issue preliminary and permanent injunctions prohibiting the Defendant, its employees and agents, and all persons acting under its direction from enforcing the above referenced Pit Bull Ban, policies, practices, and customs;

3.      Grant Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws; and

4.      Grant all such other and further relief as this Court deems just and proper.

Dated this 12th day of May 2020.

RACHAEL DANKER, JOHN DOE, JESSE JOHNSON, SAMANTHA JOHNSON, AMANDA JUNGMAN, STEPHANIE NELSON, AUBREY WILHITE, DON WILLIAMS, and JULIE WILLIAMS, Plaintiffs,

BY:    */s/ Quinn R. Eaton*
       Gene Summerlin – NE #19611
       (*pro hac vice pending*)
       Kamron Hasan – NE #25494
        (*pro hac vice pending*)
       Quinn R. Eaton – # AT0013543
       HUSCH BLACKWELL, LLP
       13330 California St., Suite 200
       (402) 964-5000
       (402) 964-5050 (fax)
       gene.summerlin@huschblackwell.com
       kamron.hasan@huschblackwell.com
       quinn.eaton@huschblackwell.com

HB: 4838-4851-7560.9