**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| RACHAEL DANKER, JESSE JOHNSON, SAMANTHA JOHNSON, STEPHANIE NELSON, AUBREY WILHITE, DON WILLIAMS, and JULIE WILLIAMS, | Case No. 1:20-cv-16 |
| Plaintiffs, | |
| v. | **PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| THE CITY OF COUNCIL BLUFFS, IOWA, | |
| Defendant. | |

## TABLE OF CONTENTS

**SUMMARY OF ARGUMENT** .......................................................................... 2

**ARGUMENT** ...................................................................................................... 5

**I. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' SUBSTANTIVE DUE PROCESS, AND EQUAL PROTECTION CLAIMS** ....................................................................................... 5

    **A. Rational Basis Review** ..................................................................... 5

    **B. Council Bluffs' Continued Application of Breed-Specific Legislation Relies On Outdated Assumptions That Have Been Scientifically Invalidated, Rendering the Pit Bull Ban's Rational Basis No Longer Viable** ...................................................... 6

    **C. Canine Genetic and Behavioral Experts Agree There is no Predictive Value between a Particular Breed of Dog or a Dog's Physical Characteristics and its Aggressiveness or Propensity to Bite** .................................................................. 8

    **D. Visual Breed Identification is Inaccurate and Inconsistent** ..................................... 11

    **E. Breed-Specific Legislation is Ineffective in Reducing Dog Bites** ........................... 14

    **F. Council Bluffs' Animal Control Records Are Unreliable** ........................................ 15

**II. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIM** ................. 18

**CONCLUSION** .................................................................................................. 21

HB: 4840-5514-2907.5

## SUMMARY OF ARGUMENT

Plaintiffs Rachael Danker, Jesse Johnson, Samantha Johnson, Stephanie Nelson, Aubrey Wilhite, Don Williams, and Julie Williams ("Plaintiffs") filed this action challenging the rational relationship between the City of Council Bluffs, Iowa's legitimate governmental interest in public safety and its ban of "pit bull" type breeds under Council Bluffs Code Chapter 4.20.112 ("Pit Bull Ban"). Plaintiffs further challenge the Council Bluffs Pit Bull Ban as violating their procedural due process rights. Aside from the yet-to-be resolved question of whether Council Bluffs' expert has the foundation to testify to most of her opinions,[1] genuine issues of material fact exist between the opinions of Plaintiffs' experts and Council Bluffs' expert which preclude Council Bluffs' entitlement to judgment as a matter of law.

**Plaintiffs' Expert Opinions**. Plaintiffs offer the opinions of canine and behavioral geneticists, animal and canine behaviorists, professionals in public health issues related to dog bites, and experts in the validity of visual identification of dog breeds who collectively explain:

•       There is nothing inherently different about pit bull dogs that set them apart from other dogs of similar size in terms of behavior, propensity to bite, or severity of bites. (Plf. SOAF ¶¶ 11, 20, 23; App. 162, 251-252, 255, 265);

---

[1] Council Bluffs offers the testimony of epidemiologist Felicia Trembath, Ph.D. as support for the Pit Bull Ban's rational relationship to a legitimate government purpose. Dr. Trembath lacks expertise in canine genetics, behavioral genetics, animal behavior, and the accuracy of visual identification of breeds. *See* ECF No.40-3, pp. 226-234, Dr. Trembath Curriculum Vitae; SOAF ¶ 9, App. 174, 179-180.

In *Droll v. City of Keota*, No. 4:20-CV-00088 (S.D. Iowa July 31, 2021), a case with a substantially similar record to the case at hand, including Defendant's proffer of expert Dr. Trembath, this Court denied summary judgment on Plaintiff's equal protection and substantive due process claims. The Court's order recognized potential credibility issues with Dr. Trembath's testimony, stating, "[a]t the very least, then, the parties are entitled to further proceedings to determine the weight and credibility to be accorded their proposed expert witnesses." *Droll v. City of Keota*, No. 4:20-CV-00088 at ECF No. 85, p. 16 (S.D. Iowa July 31, 2021).

HB: 4840-5514-2907.5

- Advances in the understanding of canine behavior, genetics, and visual identification of dog breeds demonstrate a lack of evidence that pit bull dogs are responsible for a disproportionate number of bites or injuries. (Plf. SOAF ¶ 49; App. 219, 262-265);

- Physical traits have no predictive value in characterizing the behavior of individual dogs exhibiting similar physical characteristics. (Plf. SOAF ¶ 15-19; App. 163, 218-219, 236-237, 240-241, 251-253);

- No well-designed, peer-reviewed study has ever shown that a breed ban has reduced the number of dog bites or the incidents of dog bite-injury hospitalizations in jurisdictions adopting bans. (Plf. SOAF ¶ 44; App. 158, 264);

- Breed bans are not a rational approach to addressing public health concerns of dog bites. (Plf. SOAF ¶ 18, 49; App. 85-92, 219, 236-237, 255, 262-265); and

- Visual breed identification, even when made by animal care professionals, is unreliable in predicting the actual breed composition of a dog. (Plf. SOAF ¶¶ 26-39; App. 83, 85-92, 108-131, 213, 216).

The opinions offered by Plaintiffs' expert witnesses are supported by the canine scientific community. The American Veterinary Medical Association, the American Veterinary Society of Animal Behavior, the Humane Society of the United States, and the ASPCA have all rejected breed bans as ineffective and scientifically misguided. (Plf. SOAF ¶¶ 50-51; App. 35-72). Like the Plaintiffs' experts, the studies conducted or reviewed by these organizations have led to the conclusion that breed is not predictive of dangerousness and visual inspection is an unreliable method of determining breed.

**Council Bluffs' Expert Opinions**. Council Bluffs, in turn, offers the testimony of Felicia Trembath, Ph.D., an epidemiologist with a master's degree in public health.

HB: 4840-5514-2907.5

Dr. Trembath opines that:

•       Pit bulls can be accurately identified based on visual inspection of physical characteristics. (Def. SOF ¶¶ 20-21);

•       Pit bulls are disproportionately responsible for dog bites and dog bite fatalities. (Def. SOF ¶¶ 9, 23);

•       Pit bulls are more likely than other breeds of dogs to inflict severe injuries by biting victims in more than one anatomical area. (Def. SOF ¶ 25);

•       Pit bulls are disproportionately responsible for attacks on other animals. (Def. SOF ¶ 24); and

•       The Pit Bull Ban is correlated with a reduction in reported dog bites in Council Bluffs. (Def. SOF ¶ 26).

While Council Bluffs argues that no genuine issues of material fact remain to be determined at trial, these contradicting expert opinions go to the heart of this case: whether *current science* supports a rational relationship between Council Bluffs' Pit Bull Ban and its legitimate interest in reducing dog bites. *See Dias v. City and County of Denver*, No. 07-CV-00722-WDM-MJW, 2010 WL 3873004, at *7 (D. Colo. Sept. 29, 2010) (holding that conflicting expert testimony regarding "the current state of the science" on whether Denver's pit bull ban was rationally related to a legitimate government purpose created a genuine issue of material fact that precluded summary judgment).

HB: 4840-5514-2907.5

<u>ARGUMENT</u>

I.  **GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' SUBSTANTIVE DUE PROCESS, AND EQUAL PROTECTION CLAIMS**

A. **Rational Basis Review**

Plaintiffs' substantive due process challenge to the City of Council Bluffs' Pit Bull Ban is subject to rational basis review. In cases that do not implicate a fundamental liberty interest, the Constitution requires that legislation "be rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997); *see also Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009) (applying rational basis review to challenge of Denver's pit bull ban). The same rational basis standard applies to Plaintiffs' equal protection claim. *City of Cleburne*, *Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Under the equal protection clause, classifications drawn by legislation must be rationally related to a legitimate state interest. *Id*.

To survive rational-basis review, government laws must be rationally related to a legitimate government interest. *See Romer v. Evans*, 517 U.S. 620, 631-33 (1996). Courts strike down laws under this standard when they "lack[] a rational relationship to legitimate state interests." *Id*. at 632; *see also Cleburne*, 473 U.S. at 446 (holding that a state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

While rational-basis review is deferential, it is meaningful and requires a serious analysis of the fit between the challenged law and the asserted justifications. Rational-basis review is <u>not</u> a rubber stamp of government conduct. *See Droll v. City of Keota*,

No. 4:20-CV-00088 at ECF No. 85, p. 15 (S.D. Iowa July 31, 2021) (stating Keota's Pit

Bull Ban is "not unreviewable as a matter of law.").

**B. Council Bluffs' Continued Application of Breed-Specific Legislation Relies On Outdated Assumptions That Have Been Scientifically Invalidated, Rendering the Pit Bull Ban's Rational Basis No Longer Viable**

If the trier of fact ultimately determines Plaintiffs' experts are correct and (1) Pit

Bulls are no more dangerous than other breeds; (2) Pit Bulls are not responsible for a

disproportionate number of bites or injuries; (3) Physical breed characteristics are not

predictive of behavior; (4) Visual inspection of a dog to determine its primary breed

more often than not leads to incorrect breed conclusions; and (5) Breed specific bans do

not result in a statistically significant reduction in dog bites – then Council Bluffs' Pit

Bull Ban lacks a rational or logical fit to Council Bluffs' admittedly legitimate

governmental purpose of reducing dog bites. *See Dias v. City & Cty. of Denver*, 567 F.3d

1169, 1183 (10th Cir. 2009) (if evidence establishes that pit bulls do not "pose a threat to

public safety or constitute a public nuisance, it is irrational for Denver to enact a breed-

specific prohibition.").[2]

---

[2] In denying summary judgment on Plaintiff's equal protection and substantive due process claims in *Droll*, a case with a substantially similar record to the case at hand, this Court found,

> [I]f true, the evidence on the record could render the classification between Pit Bull Breeds and other dog breeds *irrational* and *implausible* as negated by significant evidence and empirical data.
> . . . .
>
> Construing all facts in the light most favorable to Plaintiff, *as the Court must*, a trier of fact could conclude (1) Pit Bulls are no more dangerous than other breeds; (2) Pit Bulls are not responsible for a disproportionate number of bites or injuries; (3) Physical breed characteristics are not predictive of behavior; (4) Visual inspection of a dog to determine its primary breed more often than not leads to incorrect breed conclusions; and (5) Breed specific bans do not result in a statistically significant reduction in dog bites.

*Droll v. City of Keota*, No. 4:20-CV-00088 at ECF No. 85, pp. 14-15 (S.D. Iowa July 31, 2021) (emphasis in original) (internal citation omitted).

HB: 4840-5514-2907.5

Council Bluffs' Pit Bull Ban is premised on outdated and now scientifically refuted assumptions that pit bulls are more dangerous, more likely to bite, and more likely to inflict severe injuries than other similarly sized breeds.  The United States Supreme Court has recognized that a law that once was rational can be rendered irrational due to changed circumstances. *United States v. Carolene Prods.*, 304 U.S. 144, 153 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."). Indeed, the filled-milk statute upheld in *Carolene Products* was invalidated a little over thirty years later when fundamental changes in the filled-milk industry rendered its continued application irrational. *Milnot Co. v. Richardson*, 350 F. Supp. 221, 224 (N.D. Ill. 1972) (noting that the "dairy market conditions and dangers of confusion which led to the passage and judicial upholding of the Filled Milk Act . . . have long since ceased to exist."); *id*. at 225 ("Prevention of confusion in the market, however valid in 1944, is no longer a valid basis to sustain the Filled Milk Act, and thus to prevent only the interstate shipment of Milnot."); *see also Brown v. Merlo*, 506 P.2d 212, 222 (Cal. 1973) (changed circumstances can make a once rational law irrational under rational basis review).

Other courts have recognized the changed-circumstances doctrine and looked to whether a rational basis exists for the legislation at the time of enforcement. *See*, *e.g.*, *Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1183 (10th Cir. 2009) (reversing the dismissal of a challenge to a pit-bull ban because under the allegations of the Complaint "although pit bull bans sustained twenty years ago may have been justified by the then-existing body of knowledge, the state of science in 2009 is such that the bans are no longer rational."); *Seaboard Air Line R.R. Co. v. City of West Palm Beach*, 373 F.2d

7

328, 329 n.3 (5th Cir. 1967) (stating that "the slightest reflection would disclose the fallacy of a rule which would require a determination of the reasonableness of a long-standing ordinance in the light of circumstances and conditions that may have existed at the time of its adoption.").

The dispute between Plaintiffs' experts and Dr. Trembath is not a mere disagreement between competing views among scientists. Dr. Trembath asserts outdated beliefs and assumptions that are no longer generally accepted by the scientific community. Scientists in canine genetics and behavior now widely acknowledge that (1) pit bulls are no more or less dangerous than similarly sized dogs of other breeds; and (2) visual identification is an inherently unreliable method of determining the breed of a dog of unknown origin.[3] Conflicting expert testimony regarding "the current state of the science" creates a genuine issue of material fact precluding summary judgment. *See Dias v. City and County of Denver*, No. 07-CV-00722-WDM-MJW, 2010 WL 3873004, at *7 (D. Colo. Sept. 29, 2010); *see also Droll v. City of Keota*, No. 4:20-CV-00088 at ECF No. 85, p. 15 (S.D. Iowa July 31, 2021) (denying summary judgment on Plaintiff's equal protection and substantive due process claims, recognizing "Plaintiff claims the facts underlying Defendant's Pit Bull Ban are *not* arguable because the ban is based on an irrational and arbitrary distinction.") (emphasis in original).

**C. Canine Genetic and Behavioral Experts Agree There is no Predictive Value between a Particular Breed of Dog or a Dog's Physical Characteristics and its Aggressiveness or Propensity to Bite**

Dr. Trembath asserts that pit bulls are disproportionately responsible for dog

---

[3] Whether pit bulls (or any other breed) have a higher likelihood of causing injury to humans requires an analysis of canine behavior and the genetic heritability of behavioral traits like aggression. Tellingly, Council Bluffs has not produced any qualified subject matter experts on these topics.

bites and dog bite fatalities. *See* Def. SOF ¶¶ 9, 23. Further, she claims pit bulls are more likely than other breeds of dogs to inflict severe injuries by biting victims in more than one anatomical area. *See* Def. SOF ¶ 25. Plaintiffs' experts fundamentally disagree with Dr. Trembath on these points.

"Breeds" are simply groupings of animals that contain similar physical traits. (Plf. SOAF ¶ 10; App. 157, 217-218).[4] Genetically, only a small percentage of genes determine the differences in physical appearance among dogs. (Plf. SOAF ¶ 13; App. 218-219, 234). ("Unlike identical twins in humans, who have identical DNA, members of dog breeds may look the same but have very different DNA . . . the notion that the presence of an anatomical feature, i.e., smooth coat, round head, or muscular body, correlates with behavior, is not based in science."). It is incorrect to assume that because the population of animals within a breed share similar physical traits, the animals share other traits such as behavior. (Plf. SOAF ¶ 19; App. 218-219, 235, 253).

While physical traits like coat color may be 100% heritable in a particular breed (i.e., the variation among different dogs is 100% controlled by genetic differences and not by environment), heritability of behavioral traits is much lower. (Plf. SOAF ¶ 15; App. 163, 241, 251-252). Exact heritability estimates vary based on how the behavioral traits are assessed and what population is studied, making heritability challenging both to assess and to interpret. (*Id*.). It is well accepted among canine geneticists that

---

[4] Defendant argues that even if the science is evolving or changing regarding the dangerousness of pit bulls, "there is a rational basis in regulating the population of dogs with the physical characteristics of pit bulls" ECF No. 40-2 p. 15. Defendant's post hoc rationalization for the Pit Bull Ban, prohibiting dogs with physical characteristics of pit bulls, is <u>not</u> distinct from banning specific breeds of dogs as "breeds" are simply groupings of animals that contain similar physical traits. (Plf. SOAF ¶ 9; App. 174, 179-180). There is no scientific support that a dog's physical characteristics is tied to its aggressiveness or propensity to bite. Further, this argument is not supported by Defendant's expert who opines specifically on pit bull breeds, not generally on "the population of dogs with the physical characteristics of pit bulls."

HB: 4840-5514-2907.5

environment has a greater effect on determining behavioral differences between dogs than genetics does and therefore, breed is not a reliable predictor of an individual dog's behavioral traits. (*Id.*). Because of this, "[a]natomical traits associated with particular dog breeds have *no predictive value* in characterizing the behavior of dogs exhibiting similar morphological characteristics" and there is no "rational, genetic or scientific basis to ban certain breeds of dogs as more dangerous or more aggressive than other breeds of dogs." (Plf. SOAF ¶ 15, 19; App. 163, 218-219, 235, 241, 251-252-253) (emphasis added).

An American Veterinary Medical Association review of the literature of dog bite injuries covering over 40 years and 12 countries concluded that breed was not a significant predictive factor of aggressiveness. (Plf. SOAF ¶ 11; App. 265). Further, scientists have not discovered a gene for aggression in dogs. (Plf. SOAF ¶ 20; App. 162, 251-252).[5]

Scientific and sociological studies proving aggressiveness is not breed specific or tied to the physical characteristics of a dog render wholly irrelevant any concerns Council Bluffs may have conceivably had about the dangers presented by pure-bred or mixed-breed pit bulls or dogs exhibiting the physical characteristics of pit bulls. Even assuming it would've been rational to apply the Pit Bull Ban when it was initially

---

[5] Not only are pit bulls no more predisposed to violence than other dog breeds, even the official United Kennel Club breed standard for the American Pit Bull Terrier highlights the breed's friendly, gentle nature. (Plf. SOAF ¶ 21; App. 20) (describing American Pit Bull Terriers as "excellent family companions and have always been noted for their love of children" and for being "not the best choice for a guard dog since they are extremely friendly, even with strangers. Aggressive behavior toward humans is uncharacteristic of the breed and highly undesirable. This breed does well in performance events because of its high level of intelligence and its willingness to work.") Similarly, the official American Kennel Club breed standard for the Staffordshire Bull Terriers states that, "with its affection for its friends, and children in particular, its off-duty quietness and trustworthy stability, makes [the Staffordshire Bull Terrier] a foremost all-purpose dog." (Plf. SOAF ¶ 22; App. 24).

HB: 4840-5514-2907.5

adopted, scientific advances in knowledge make its application irrational today. The assumptions on which the Pit Bull Ban was predicated no longer exist because they have been proven false, making application of the law to Plaintiffs today, irrational. *See United States v. Carolene Prods. Co.*, 304 U.S. at 153 ("the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."). For the Pit Bull Ban to pass constitutional muster in 2021, Council Bluffs must provide a credible factual basis to justify *this* piece of legislation *today*.

### D. Visual Breed Identification is Inaccurate and Inconsistent

Trembath asserts (1) that "[t]he industry standard for identifying dogs is by using visual inspection and comparing to published breed standards" and (2) that "[i]t is a myth that pit bulls cannot be accurately identified based upon a visual inspection of physical characteristics. *See* Def. SOF ¶¶ 20-21. As her *only* support that visual identification is accurate, Trembath's expert report cites to the blog post, *Bully This – The Results Are In...*, which she purports finds that the Richmond SPCA found that animal shelter workers were 96% accurate in identifying dogs with at least 25% bull breed DNA as pit bull mixes. *See* ECF No. 40-3, p. 239, Def. App. 237.

The author of that article, Dr. Emily Weiss, flatly rejects Trembath's misuse of the Richmond SPCA post as support for the premise that visual identification of breed is accurate. "The Project was not intended or designed to test the accuracy of visual identification of mixed breed dogs of unknown origin or rebut the findings of other published peer-reviewed studies on this topic" such as those authored by Dr. Voith. (App. 4–5: Dr. Weiss Dec., ¶ 5). Dr. Weiss also points out that Trembath's

11

"generalizations from the Project, particularly concerning issues that the Project wasn't designed to examine" are "unrealistic and likely invalid." (*Id.*).

Dr. Victoria Voith has conducted three systematic studies to analyze the consistency and reliability of visual breed identifications, two of which have been peer-reviewed and published. (Plf. SOAF ¶ 26; App. 83, 90-92, 108-118). Data from the third study has been collected and analyzed and is being prepared for submission to a peer reviewed veterinary medical journal. (*Id.*). All three studies show that visual breed identification, even when made by animal care professionals, is unreliable to predict the actual breed composition of an animal.[6] (Plf. SOAF ¶ 27; App. 85-92, 216).

Dr. Voith's first study compared identifications of 20 mixed-breed dogs made by adoption agencies using visual identification to determine breed as compared to DNA breed identification through DNA testing. (Plf. SOAF ¶ 28; App. 87-90). Dr. Voith's second study compared visual breed identifications of the same 20 dogs and assessed the inter-observer reliability (agreement) of those identifications. (*Id.*; App. 88-90). Over 900 people engaged in dog professions or activities viewed photographs of the 20 dogs and were asked if they thought it was a purebred, what was the most predominate breed of the dog, and if possible, what was the second most predominant breed. (*Id.*). Dr. Voith's third study compared visual and DNA dog breed identifications with and without use of identification resources. (Plf. SOAF ¶ 30; App. 90-92). This study addressed whether use of identification resources (e.g. dog breed books, pictorial charts, and lists of the names of breeds of dogs) influenced the accuracy of visual identifications. (*Id.*).

---

[6] Council Bluffs' Animal Control Officers testified to receiving no training to enforce the Pit Bull Ban, including no formal training on breed identification, other than reading the ordinance and on-the-job training. (Plf. SOAF ¶ 40; App. 134-135, 139, 142, 166, 142).

HB: 4840-5514-2907.5

Dr. Voith's research shows that visual breed identification *fails more often than not* in detecting "pit bull" DNA. (Plf. SOAF ¶ 29; App. 124, App. 213) (finding that the "predominant" breed determined based on visual inspection matched the predominant breed identified by DNA analysis for only 25% of dogs). This is true even when identification is performed by breed "experts." (*Id*.). Voith's 2013 study found that most participants "engaged in dog related professions and activities" agreed on the "predominant" breed—the exact standard incorporated by the Pit Bull Ban—for only seven out of 20 dogs, or 35%, of the dogs inspected. (Plf. SOAF ¶ 29; App. 124, 213). Among those seven dogs, DNA testing confirmed the identified "predominant" breed for only three of the dogs inspected. (*Id*.). Only three of the twenty dogs—15%—were consistently and accurately visually identified. (*Id*.). Whether measured against a dog's DNA determined breed or against agreement with other observers, visual identification produced significant error rates. Dr. Voith's most recent study suggests that use of dog breed identification resources does not improve the accuracy or consistency of visual identifications of mixed-breed dogs. (Plf. SOAF ¶¶ 30-31; App. 90-92). [7]

Council Bluffs' reliance on visual breed identification[8] to determine whether an animal is subject to the Pit Bull Ban or whether a specific breed was involved in a biting

---

[7] As further support that visual breed identification is unreliable and inaccurate, the National Animal Control Association's ("NACA") training manual states visual identification of heritage of a mixed-breed dog is nearly impossible. (Plf. SOAF ¶ 33; App. 11). The NACA Manual advises that AKC breed standards only provide "the ideal example" of the breed, and that many dogs which do not pass the ideal standards "are sold as 'pet quality' dogs." (Plf. SOAF ¶ 34; App. 11). The NACA manual also states that "Animal Control Officers don't often come face-to-face with ideal representatives of the various breeds," and that many dogs bred unconventionally may "bear little more than a faint resemblance to the breed standard." (*Id*.). The NACA manual further addresses that there are more than twenty breeds of dogs commonly *misidentified* as pit bulls. (Plf. SOAF ¶ 35; App. 11).

[8] Council Bluffs' Animal Control Officers testified to primarily using visual identification to determine the breed of a dog. (Plf. SOAF ¶ 41; App. 135, 139, 142, 146, 167-168).

HB: 4840-5514-2907.5

incident incorporates an inaccurate and unreliable methodology for enforcement and data collection. The arbitrary and irrational results of visual identification of breed (1) calls into question the validity of Council Bluffs' "bites by breed" data; and (2) severs any relationship between the ordinance and a purportedly legitimate government interest and fails to *advance* the governmental interest. *See United States v. King*, 972 F.2d 1259, 1260 (11th Cir. 1992) ("to pass the rational basis test . . . it must have been reasonable for lawmakers to believe that the use of the challenged classification would *promote* [the governmental] purpose."). When the means of identifying animals subject to the ban is inaccurate more often than not, no rational legislator could have intended that outcome.

### E.  Breed-Specific Legislation is Ineffective in Reducing Dog Bites

Trembath makes the claim that Council Bluffs' Pit Bull Ban is correlated with a reduction in reported dog bites in Council Bluffs. *See* Def. SOF ¶ 26. Plaintiffs' experts disagree. Despite similar bans having existed since the 1980s, not one well-designed peer-reviewed study has ever been produced showing that a ban has reduced the number of dog bites or the incidents of dog bite-injury hospitalizations in jurisdictions adopting bans. (Plf. SOAF ¶ 44; App. 158, 264). Surveys conducted in the U.K. and in Germany have found no efficacy to breed-based bans, often resulting in the repeal of such bans. (*Id.*). Italy and the Netherlands have also recently repealed such laws, and nineteen U.S. states preempt their towns and counties from regulating dogs based on breed. (*Id.*).

Due to the inefficacy of breed bans, the lack of evidence that breeds are predictive of dangerousness, and the recognized difficulty in determining breed by visual identification, multiple organizations have rejected breed specific legislation, including

14

the American Kennel Club, the American Veterinary Medical Association, the American Veterinary Society of Animal Behavior, the ASPCA, the Humane Society of the United States, and the American Bar Association. (Plf. SOAF ¶¶ 50-51; App. 35-72).

**F. Council Bluffs' Animal Control Records Are Unreliable**

Council Bluffs relies on a set of records gathered and maintained by Council Bluffs' Animal Control to support a rational relationship between its Pit Bull Ban and its legitimate interest in reducing dog bites. (*See* Def. SOF ¶¶ 3-5, 9-10, 26). Council Bluffs relies on the records to show (1) in Council Bluffs pit bull dogs were responsible for a disproportionate number of bites and (2) the Pit Bull Ban has succeeded in reducing dog bites in Council Bluffs. (*Id*.). The Animal Control records are unreliable for these purposes because the methodology used to determine that pit bull dogs were responsible for a disproportionate number of bites is flawed and the records lack sufficient historical data to establish that the ban has been successful in reducing dog bites

  *i. The Methodology used to Determine Pit Bull Dogs were Responsible for a Disproportionate Number of Bites in Council Bluffs is Flawed.*

The methodology used by Council Bluffs to determine whether a disproportionate number of bites are caused by pit bull dogs is flawed because it relies on (1) the number of dogs licensed in Council Bluffs as a proxy for the population of pit bull dogs and (2) visual identification of dogs involved in biting incidents. To demonstrate pit bull dogs were responsible for a disproportionate number of bites in Council Bluffs, the number of pit bull dogs licensed was compared to the total licensed dog population to determine what percentage of the Council Bluffs' licensed dog population were pit bull dogs. (Def. SOF ¶¶ 4, 5, 9). This was then compared to the number of pit bull dogs reported as being

15

responsible for dog bites. (*Id.*). Using dog licensing as a proxy for dog population and the pit bull population is unreliable. As addressed by the AVMA's Task Force on Canine Aggression and Human-Canine Interactions:

> There are several reasons why it is not possible to calculate a bite rate for a breed or to compare rates between breeds. First, the breed of the biting dog may not be accurately recorded, and mixed-breed dogs are commonly described as if they were purebreds. Second, the actual number of bites that occur in a community is not known, especially if they did not result in serious injury. Third, the number of dogs of a particular breed or combination of breeds in a community is not known, because it is rare for all dogs in a community to be licensed, and existing licensing data is then incomplete. Breed data likely vary between communities, states, or regions, and can even vary between neighborhoods within a community.

It is not supportable to use the small percentage of dogs licensed as proxy for the dog population at large or dog population by breed. (App. 255: Dr. Lockwood Dec. ¶ 8; App. 160: Dr. Lockwood Dep. 55:9-15). The flaw in using licensing as a proxy for population was recognized by Chief Animal Control Officer Barrett, who testified it would not surprise him to learn some jurisdictions found their licensed dog population to only be a third of their total population as this is consistent with his on-the-ground experience. (App. 151: G. Barrett Dep. 44:16-25). Further, Animal Control Officer ("ACO") Dadie File testified that she encounters dogs daily that are not licensed and estimates in her experience that 50% of the dogs she encounters are not licensed. (App. 168: D. File Dep, 16:4-15).

Plaintiffs' expert Dr. Lockwood testified it is inherently false that breed-related differences have no impact the level of licenses or registrations. (App. 159-160: Dr. Lockwood Dep. 52:19-22; App. 255: Dr. Lockwood Dec., ¶ 8). As Dr. Lockwood points out, owners of controversial breeds or types of dogs, like pit bulls, are less likely to register altogether, or if they do register, likely to register as something other than the

stigmatized breed. (App. 160: Dr. Lockwood Dep. 53:1-6; App. 256: Dr. Lockwood Dec., ¶ 8). Further, the stereotype and stigma surrounding pit bull type dogs creates a known bias to label a mixed breed dog involved in an attack as a pit bull which calls into question the accuracy of the Council Bluffs' Animal Control records for bites per breed. (App. 256: Dr. Lockwood Dec., ¶ 9).

In addition, as discussed in Section I(D) *supra*, visual identification is unreliable, calling into question the accuracy of the number of dogs reported as pit bulls either for licensing purposes or in bite reports. Council Bluffs' ACOs primarily determine the breed of a dog to perform their duties by visual identification. (SOAF ¶ 41; App. 135, 139, 142, 146, 167-168). Chief ACO Barrett testified the breed information from the Animal Control Records he compiled is primarily collected by ACOs who primarily determine breed based on visual identification. (*Id.*). Chief ACO Barrett further agreed that to the extent visual identification of breed is inaccurate than the breed identifications appearing on the Animal Control Records he compiles is also inaccurate because it is based on visual identification. (SOAF ¶ 43; App. 149).

ii. *Council Bluffs Animal Control Records are Insufficient to Demonstrate the Pit Bull Ban Has Successfully Reduced Dog Bites in Council Bluffs.*

Council Bluffs' Animal Control records are also used by the City to show the Pit Bull Ban has succeeded in reducing dog bites in Council Bluffs. Council Bluffs' Pit Bull Ban was passed into law on November 8, 2004 and became effective January 1, 2005. (*See* EFC No. 40-3, p. 19, Def. App. 17). Council Bluffs' Chief ACO Barrett, began compiling Animal Control records in 2003. (*See* EFC No. 40-3, p. 297, Def. App. 295, Aff. of G. Barrett at ¶ 9; EFC No. 40-3, pp. 300-301, Def. App. 298-299, Aff. of G. Barrett at ¶ Ex. 2). Following the adoption of the Pit Bull Ban in 2005, Council Bluffs

HB: 4840-5514-2907.5

experienced a record number of bites per year – 132 bites, in 2006. (EFC No. 40-3, p. 301, Def. App. 299). Further, the Council Bluffs' Animal Control records demonstrate that the bites per year fluctuate and without historical data before 2003, it is impossible to accurately determine the effect the enactment of the Pit Bull Ban has had on dog bites in Council Bluffs. The lack of historical data was discussed by Defendant's expert, Dr. Trembath, who testified she did not have sufficient data from before Council Bluffs' Pit Bull Ban was enacted to create an accurate statistical analysis comparing dog bites before and after the law was enacted. (App. 175-176: CB Trembath Dep. at 152:16–153:2; *Cf id.* at 29:18–30:21 (stating that she could not determine if there was a significance to the reductions in dog bites based on the data she was provided for the period before the pit bull ban was enacted)). Further, Dr. Trembath testified the Council Bluffs data she was provided to run the comparisons had discrepancies. (App. 171: CB Trembath Dep. at 12:13–18; *Cf id.* at 46:19–47:24 (discussing a discrepancy between the data Trembath was provided and used in preparing her report and the dog bite data produced to Plaintiffs during discovery)). Dr. Trembath did not have access to the bite reports to verify the accuracy of information provided to her by Council Bluffs. (*Id.* at 11:7–12:9). As recognized in Dr. Trembath's expert report, "[w]e cannot determine from this data that the BSL caused the decrease in dog bites." (ECF No. 40-3, p. 264, Def. App. 262). As discussed in Section I(E) *supra*, there is no evidence that breed-specific legislation has been effective in reducing dog bites.

## II.  GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIM

The Council Bluffs' Pit Bull Ban offends due process and Defendant is not entitled to judgment as a matter of law on Plaintiffs' procedural due process claim. Defendant

cannot deprive individuals of their property without due process of law. [9] U.S. Const. amend. XIV, § 1. Due process requires notice and the opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985). There must be "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). To determine the process due before the deprivation of a property interest, courts balance three factors: (1) the nature and weight of the private interest affected by the challenged official action; (2) the risk of an erroneous deprivation of such interest because of the summary procedures used; and (3) the governmental function involved and state interests served by such procedures, and the administrative and fiscal burdens, if any, that would result from the substitute procedures sought. *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987, 994 (8th Cir. 2016).

Defendant's process is rife with procedural deficiencies, including but not limited to: (1) placing the burden of proof on the owner to show that a dog is not a pit bull but failing to provide the quantum of evidence that a dog owner must satisfy to prevail at a hearing; (2) providing that owners must submit their facts at the hearing under oath and affirmation without a corresponding requirement on the city; (3) failing to provide a period of time in which a breed-determination hearing must be held while impoundment fees continue to accrue at the owner's expense; (4) providing no mechanism for an owner to receive an official breed determination before a dog is

---

[9]  Courts have consistently treated dogs as property, including for the purposes of Fourth and Fourteenth Amendment Claims. *E.g.*, *Andrews v. City of W. Branch*, 454 F.3d 914, 918 (8th Cir. 2006)("A dog is considered property for Fourth Amendment purposes."); *Frost v. City of Sioux City*, 2017 WL 4126986, *6 (N.D. Iowa 2017) (finding that dogs may be treated as property for the purposes of a Fourteenth Amendment claim); *Folkers v. City of Waterloo, Iowa*, 582 F. Supp. 2d 1141, 1150–52 (N.D. Iowa 2008) (treating dogs as property for the purposes of the Fourth and Fourteenth Amendments).

HB: 4840-5514-2907.5

seized; and (5) providing no mechanism to return impoundment fees to an owner whose dog was wrongfully impounded. Defendants' statement of facts and memorandum of law fail to address most of these procedural deficiencies.

The Court need look no further than the cases cited by Council Bluffs themselves to determine that Defendant is not entitled to a judgment as a matter of law on Plaintiffs' procedural due process claim. In its Memorandum in Support of Motion for Summary Judgment, Defendant cites three cases in which it asserts that courts found similar ordinances satisfied due process. However, two[10] of those cases held that certain provisions of pit bull bans, which are identical or substantially the same as provisions within the Council Bluffs ordinance, offended procedural due process. *See Colo. Dog Fanciers, Inc, v. City & Cty. of Denver*, 820 P.2d 644, 648 (Colo. 1991) ("Because the ordinance fails to apprise dog owners of the quantum of evidence necessary to prevail at [the] hearing, it may encourage arbitrary enforcement and is thus constitutionally infirm."); *Newman v. City of Payette*, 2015 WL 6159471, *12 (D. Idaho 2015) (holding that provisions of the pit bull ban offended due process because (1) they failed to apprise owners of the quantum of evidence necessary to prevail at the hearing and (2) they required the owners to submit facts at the hearing under oath and affirmation without a corresponding requirement on the city). The cases cited by Defendant establish, at the very least, that Council Bluffs is not entitled to judgment as a matter of law on the

---

[10] The ordinance examined in third case cited by the city in its Memorandum is not comparable to the Council Bluffs Ordinance nor does it address the specific infirmities presented within Council Bluff's ordinance. *See Garcia* v. *Village of Tijeras*, 767 P.2d 355 (N.M. Ct. App. 1988). The ordinance at issue in *Garcia* contemplated that a hearing to determine that an animal was a pit bull would be held before a court. *Id.* at 361. The Court found that the requirement of a judicial determination itself contemplates that the determination will comport with due process. *Id.* Therefore, the ordinance was not infirm simply because it did not set out procedures for the hearing. *Id.* The hearing under the Council Bluffs ordinance is not before a court and the express procedural provisions of the ordinance governing themselves offend due process.

HB: 4840-5514-2907.5

procedural due process claim because the Council Bluffs ordinance lacks the quantum of evidence necessary for a dog owner to challenge the city's determination that a dog is a pit bull and requires the owner but not the city to submit their facts under oath and affirmation at the hearing. These provisions, along with several others, prevent dog owners from having a meaningful opportunity to be heard to rebut the city's determination that a dog is a pit bull and may encourage arbitrary enforcement of the Pit Bull Ban. Therefore, the city's ordinance is constitutionally infirm and Defendant's motion for summary judgment should be denied.

## CONCLUSION

Plaintiffs respectfully request this Court deny the City of Council Bluffs' Motion for Summary Judgment.

Dated this 1st day of October 2021.

RACHAEL DANKER, JESSE JOHNSON, SAMANTHA JOHNSON, STEPHANIE NELSON, AUBREY WILHITE, DON WILLIAMS, and JULIE WILLIAMS, Plaintiffs,

BY:    */s/Gene Summerlin*
Ryann A. Glenn – #AT0010530
Gene Summerlin – NE #19611
(*admitted pro hac vice*)
Kamron Hasan – NE #25494
(*admitted pro hac vice*)
Amanda L. Wall – NE #26872
(admitted Pro Hac Vice)
HUSCH BLACKWELL, LLP
13330 California St., Suite 200
(402) 964-5000
(402) 964-5050 (fax)
ryann.glenn@huschblackwell.com
gene.summerlin@huschblackwell.com
kamron.hasan@huschblackwell.com
amanda.wall@huschblackwell.com

HB: 4840-5514-2907.5

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of October 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification to all counsel of record.

*/s/Gene Summerlin*

HB: 4840-5514-2907.5